AO 91 (Rev. 11/11)   Criminal Complaint

LODGED
CLERK, U.S. DISTRICT COURT
03/15/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AP _____ DEPUTY

# UNITED STATES DISTRICT COURT
for the
Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT
3/15/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ ram _____ DEPUTY

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| v. | ) | |
| DAVID GUILLERMO CORRAL-CARDENAS, | ) | Case No.  5:23-mj-00111 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of _____October 13, 2022_____ in the county of _____San Bernardino_____ in the _____Central_____ District of _____California_____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846, and 856 | See attached affidavit |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

/s/ signed pursuant to Fed. R. Crim. P. 4.1
*Complainant's signature*

DEA Special Agent, Paul Gelles
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  March 15, 2023

*Judge's signature*

City and state:  Riverside, CA

Hon. Kenly Kiya Kato, U.S. Magistrate Judge
*Printed name and title*

*AUSA:*   Abigail W. Evans 951-276-6086

## AFFIDAVIT

I, Paul Gelles, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Drug Enforcement
Administration ("DEA"), and am an investigative or law
enforcement officer of the United States within the meaning of
18 U.S.C. § 2510(7). I am empowered to conduct investigations
of, and to make arrests for, federal felony offenses enumerated
in 18 U.S.C. § 2516.

2.   I have been employed by the DEA since 1999. During
this time, I completed an intensive 17-week DEA training academy
in Quantico, Virginia, which provided me with a background and
basis of knowledge relating to the investigation of drug related
crimes, including but not limited to, the manufacture,
importation and sale of controlled substances, including
methamphetamine, cocaine, fentanyl, heroin, and marijuana. I
have received training in the identification of most types of
controlled substances, by sight and odor. By virtue of my
employment with the DEA, I have participated in various tasks
which include, but are not limited, to: 1) Functioning as a
surveillance agent and thereby observing and recording movements
of persons trafficking drugs and those suspected of trafficking
drugs; 2) Interviewing cooperating individuals and informants
relative to the illegal trafficking of drugs and the
distribution of monies and assets derived from the illegal
trafficking of drugs; 3) Functioning as a case agent which
entails the supervision of specific investigations involving the

trafficking of drugs; and, 4) Executing arrest warrants, search warrants, consent searches, Fourth Amendment waiver searches, and participating in the arrests of drug traffickers. I have had formal training and experience in controlled substance investigations; and I have become familiar with the manner in which controlled substances are packaged, marketed, cultivated, manufactured, and consumed.

3.    Currently I am assigned to the DEA Riverside District Office ("RDO") Group 2, and have been so assigned since November 2021. Prior to my assignment to the RDO, I was assigned to the San Diego Field Division Organized Crime Drug Enforcement Task Force (OCDETF) Group 1, and the San Diego County Regional Narcotic Task Force (NTF). Prior to my assignment in San Diego, I was assigned to the Bogotá, Colombia Country Office Anti-Money Laundering Unit, in Bogotá, Colombia. Prior to my employment with the DEA I was employed as a Patrol Agent with the United States Border Patrol in San Diego, California from 1997 to 1999.

## II.  PURPOSE OF AFFIDAVIT

4.    This affidavit is made in support of a criminal complaint against, and arrest warrant for, David Guillermo CORRAL-CARDENAS ("CORRAL-CARDENAS") (**"TARGET SUBJECT"**) for a violation of Title 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute, a Controlled Substance), 846 (Attempt and Conspiracy to Commit Controlled Substance Offense), and 856 (Maintaining Drug-Involved Premises) (the "Subject Offenses").

5.    This affidavit is also made in support of a search warrant for 365 West 6th Street, San Jacinto, California ("**SUBJECT PREMISES 1**") described in Attachment A-1, and 10776 Cherry Avenue, Cherry Valley, California ("**SUBJECT PREMISES 2**") described in Attachment A-2,[1] for the items to be seized described in Attachment B.

6.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of the investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

### III.  PREMISES TO BE SEARCHED

7.    The PREMISES to be searched are **SUBJECT PREMISES 1** described in Attachment A-1, and **SUBJECT PREMISES 2** described in Attachment A-2, which are incorporated herein by reference.

### IV. ITEMS TO BE SEIZED

8.    The items to be seized are the evidence, fruits, and instrumentalities of violations of Title 21 U.S.C. §§ 841(a)(1)

---

[1]  Situated on the property of **SUBJECT PREMISES 2** is a single-story, single-family residence ("main residence"), in addition to the trailer and the shed described in Attachment A-2.  This application does not seek authorization to search the main residence.

(Manufacturing, Distribution of, and Possession with Intent to Distribute, a Controlled Substance), 846 (Attempt and Conspiracy to Commit Controlled Substance Offense), and 856 (Maintaining Drug-Involved Premises) (the **"SUBJECT OFFENSES")**, as described in Attachment B, which is incorporated herein by reference.

## V.  SUMMARY OF PROBABLE CAUSE

9.   Since September 2022, members of the DEA RDO have been investigating the drug trafficking activities of CORRAL-CARDENAS. Based on the investigation to date, the DEA has seized approximately four kilograms (8.8 pounds) of fentanyl powder shipped by CORRAL-CARDENAS from UPS Stores located in Beaumont and Yucaipa, California. Additionally, law enforcement has seized or has attempted to seize two UPS parcels containing suspected drug proceeds that were shipped to properties associated with CORRAL-CARDENAS, which are identified as **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2**.

10.   On November 21, 2022, CORRAL-CARDENAS mailed a UPS parcel containing a kilogram of fentanyl from the Yucaipa UPS Store to a location in Atlanta, Georgia. A UPS Store employee observed the person who mailed the parcel depart the UPS Store in a white Jeep bearing California license plate 9CNT200 ("white Jeep"). A Department of Motor Vehicles registration inquiry revealed the white Jeep was registered to CORRAL-CARDENAS' wife, at their shared residence located at 365 West 6th Street, San Jacinto, California (hereafter referred to as **"SUBJECT PREMISES 1"**). A law enforcement check revealed that in December 2022, local law enforcement officers seized an inbound parcel from

Atlanta, Georgia, containing $20,000 U.S. Currency, that was shipped to **SUBJECT PREMISES 1.**

11.   While conducting surveillance of **SUBJECT PREMISES 1** on or about February 1, 2023, I observed CORRAL-CARDENAS, and recognized him from UPS Store surveillance footage as the person who had shipped the fentanyl-laden parcels. During this surveillance, agents observed CORRAL-CARDENAS drive the white Jeep and a gold-colored Toyota Corolla ("gold Toyota Corolla"). During a subsequent traffic stop, CORRAL-CARDENAS identified himself to Riverside Sheriff Deputies with a valid California driver's license as David Guillermo CORRAL-CARDENAS.

12.   In February 2023, I obtained a California State search warrant authorizing the installation and GPS monitoring of CORRAL-CARDENAS' white Jeep and gold Toyota Corolla. On February 13, 2023, I observed through GPS monitoring that the gold Toyota Corolla had traveled to the UPS Store in Beaumont, California. I and SA Dennis Schupp subsequently went to the Beaumont UPS Store and confirmed that an individual matching the description of CORRAL-CARDENAS had paid to ship a parcel to Atlanta, Georgia. A subsequent free air sniff by a narcotic detection canine resulted in a positive alert to the odor of narcotics emanating from the parcel. I requested and was granted a California State search warrant for the package.  When I searched the package, I found one kilogram of fentanyl, contained within various layers of wrapping, which were in a Vaultz brand "Cash Box", further wrapped in a foam roll material.

13.   A review of the GPS location of the gold Toyota Camry revealed that on February 13, 2023, before shipping the fentanyl-laden parcel, CORRAL-CARDENAS, traveled to the Walmart Superstore in Beaumont, California ("Walmart Beaumont"). A review of Walmart Beaumont surveillance footage from February 13, 2013 showed CORRAL-CARDENAS purchasing several items used to package the kilogram of fentanyl, including gloves, foam wrap, and the identical Vaultz brand "Cash Box" found to contain the kilogram of fentanyl. GPS monitoring of the gold Toyota Corolla revealed that after purchasing that packaging material, CORRAL-CARDENAS traveled to a property located at 10776 Cherry Avenue, Cherry Valley, California (hereafter referred to as "**SUBJECT PREMISES 2**"), before he drove to the Beaumont UPS Store. Therefore, it is likely that he packaged the kilogram of fentanyl at **SUBJECT PREMISES 2** before attempting to ship the drug-laden parcel from the Beaumont UPS Store.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   **Background**

14.   On September 16, 2023, SA Jasmin Garcia received information from a UPS Store employee (hereafter referred to as the "Source of Information" or "SOI")[2] regarding an individual who had previously shipped two suspicious parcels from the UPS Store in Yucaipa, California. The SOI stated that on September 12, 2023, a bearded Hispanic male wearing a ball cap and

---

[2] The SOI is an employee of the "UPS Store," a franchise of United Parcel Service (UPS) and not an employee of UPS. The SOI has not been financially compensated for providing the information, and volunteered the information as a civic duty.

sunglasses, paid cash to ship two "Next Day Air" parcels -- one to Cleveland, North Carolina and the second to Rochester, New York. The SOI provided SA Garcia with several digital still photos from the UPS Store surveillance camera of the bearded male shipping the parcel.

15.   Based on my training and experience, I know Next Day Air shipping to be the most expensive shipping option, and typically used to ship high value or priority items. Through training and experience, I have learned that persons trafficking in contraband through parcel companies will use the quickest shipping method, regardless of cost, to reduce the time that the item is not in the shipper and/or recipient's possession. Based on my training and experience, I know drug traffickers commonly use parcel companies and third-party shippers to transport narcotics in order to avoid the risk of personally transporting or traveling with narcotics. I further know that by using parcel companies, narcotic traffickers can ship large quantities of drugs from source locations such as California, to large consumer communities such as New York, North Carolina, and Georgia.

16.   Additionally, based on my training and experience, I know persons trafficking in narcotics via parcel companies typically use fictitious names and addresses in an attempt to evade law enforcement detection and apprehension. Moreover, I know such persons will typically pay in cash, to avoid leaving an electronic trail that can be traced back to them. Based on my training and experience, I know it is common for persons

shipping narcotics via parcel companies to tape all the seams of the parcel, in an attempt to prevent the parcel from being tampered with or inspected, to conceal suspicious odors, and to thwart detection of the narcotics by detection canines.

17.   Based on the foregoing, SA Garcia and I formed the opinion that the two parcels shipped by the bearded male on September 12, 2022 to Rochester, New York and Cleveland, North Carolina likely contained controlled substances in violation of Title 21 U.S.C. 841(a)(1).

**B.    Seizure of 2 Kilograms of Fentanyl on 10/13/2022**

18.   On October 12, 2022, SA Garcia received information from the SOI that the same bearded male had shipped two additional parcels; the first to Cleveland, North Carolina and the second to Atlanta, Georgia.

19.   The SOI advised that the first UPS parcel, bearing tracking number 1ZA2R1590104224493, was listed as being shipped by Joan Ruiz, 34931 Date Avenue, Yucaipa, California and was addressed to Mr. Robertson, 5075 Foster Road, Cleveland, North Carolina. SA Garcia forwarded the information related to this parcel to the DEA Greensboro Resident Office and the Guilford County Sheriff Department for further investigation.

20.   The SOI advised that second UPS parcel, bearing tracking number 1ZA2R1590137555163, was listed as being shipped by Joan Ruiz, 34931 Date Avenue, Yucaipa, California and was addressed to Maurice Johnson, 221 Dodd Avenue SW, Apartment 201, Atlanta, Georgia. SA Garcia subsequently forwarded the information related to this parcel to the DEA Atlanta Field

Division for further investigation, however agents were
unsuccessful in interdicting the package.

21. On October 13, 2022, members of the Guilford County
Sheriff Department, while conducting interdiction operations at
the UPS Facility in Salisbury, North Carolina, located the
parcel bearing tracking number 1ZA2R1590104224493. Upon
retrieving the parcel, deputies observed the package appeared to
be excessively taped, consistent in the manner that narcotic
traffickers package drug-laden parcels in an attempt to thwart
drug detection canines. Deputies further conducted a law
enforcement and commercial database search and were unable to
associate either the sender or recipient of the parcel with
either shipping or receiving address. Detective Sergeant K.J.
Cornell deployed narcotics detection canine "Maggie" to conduct
a free air sniff of the parcel, and "Maggie" alerted to the odor
of narcotics emanating from the package. A statement describing
Sergeant Cornell's and Maggie's training and experience in
narcotics detection is attached hereto as Exhibit A. Law
enforcement officers obtained a North Carolina State search
warrant for the package that resulted in the seizure of two
individual kilogram shaped bricks of compressed white powder.
The two kilograms shaped bricks were submitted to the North
Carolina Department of Justice State Crime Lab for analysis and
safekeeping. Crime lab chemists conducted an analysis of one of
the two individual kilogram bricks and determined the white
compressed powder to be fentanyl.

**C.      Seizure of 1 Kilogram of Fentanyl on December 9, 2022**

22.  On November 21, 2022, the SOI advised that the same bearded individual had shipped another "next day air" parcel to Atlanta, Georgia.

23.  The SOI advised that the UPS parcel, bearing tracking number 1ZA2R1590114247379, was listed as being shipped by Leonardo Ruiz (951)392-9398, 296 Myrtlewood Drive, Calimesa, California to Richard Alexander, 466 Chappell Road NW, Atlanta, Georgia.

24.  The SOI further advised that the bearded male who delivered this parcel, and the previous described parcels, had arrived in a white Jeep bearing California license 9CNT200 (the "white Jeep"). A DMV registration query revealed the white Jeep was registered to Karisma L. Otanez, at 365 West 6th Street, San Jacinto, California ("**SUBJECT PREMISES 1**").

25.  SA Garcia subsequently forwarded the information to the DEA Atlanta Field Division for further investigation, however agents were unsuccessful in interdicting the package.

26.  On December 6, 2022, SA Garcia received information that the UPS parcel bearing tracking number 1ZA2R1590114247379 was deemed undeliverable and returned to the Yucaipa UPS Store. Due to the return of the parcel, UPS issued a new tracking number (1ZA2R1591214247376) to facilitate its return to the originating UPS Store location.

27.  On December 9, 2022, SA Garcia and I traveled to the UPS Store and recovered the UPS parcel now bearing tracking number 1ZA2R1591214247376. Upon receipt of the parcel, SA Garcia

and I observed that the parcel appeared to be excessively taped at the seams and flaps. SA Garcia and I further observed a small gap in the bottom flaps, providing a partial view of the parcels' contents visible through the clear packing tape. SA Garcia and I observed what appeared to be a brick shaped object wrapped in cellophane packaging.

28.   On December 9, 2022, the Honorable John Vander Feer, Judge of the Superior Court of California, County of San Bernardino, signed a California State search warrant authorizing the search of the parcel. Upon opening the parcel, SA Garcia and I observed a brick shaped object wrapped in cellophane packaging and white thin foam material. Under the cellophane and foam wrapping, agents observed a Vaultz brand "Cash Box," further containing a kilogram shaped brick of compressed white powder, contained within a white plastic trash bag, translucent plastic wrapping, and a layer of a red jelly like substance. A subsequent lab analysis conduct by the DEA Southwest Regional Laboratory ("SWRL") revealed that the kilogram of compressed white powder tested positive for fentanyl.

**D.   Shipment of $10,000 in Drug Proceeds to SUBJECT PREMISES 2**

29.   During December 2022, DEA RDO Task Force Officer ("TFO") Michael Callahan contacted me regarding the identification of the white Jeep during an independent narcotic investigation. TFO Callahan advised me that during October 2022, he was assisting investigators from the New York Attorney General's Office ("NYAGO") related to an ongoing fentanyl and

cocaine investigation. TFO Callahan stated that NYAGO investigators advised they had information that a "Next Day Air" UPS parcel, bearing tracking number 1Z2RY9621343200025, was believed to contain $10,000 in drug proceeds. The investigators further advised that the UPS parcel was to be delivered on October 18, 2022, to a property, located at 10776 Cherry Avenue, Cherry Valley, California ("**SUBJECT PREMISES 2**"). A subsequent inquiry to UPS security revealed the UPS parcel was delayed and was scheduled to be delivered the following morning, on October 19, 2022.

30.   TFO Callahan stated that on October 19, 2022, members of the RDO DEA established surveillance of **SUBEJCT PREMISESS 2**, in anticipation of the delivery of the UPS parcel containing the suspected $10,000 in narcotic proceeds. TFO Callahan stated that during the course of the surveillance, officers observed a UPS delivery truck arrive at **SUBJECT PREMISES 2**. TFO Callahan stated that the UPS driver exited the truck carrying a UPS parcel, and spoke with an unidentified individual at the front door of **SUBJECT PREMISES 2**, before returning to the UPS truck and departing. TFO Callahan advised that he later learned from UPS Security that the receipt of the UPS parcel, containing the suspected drug proceeds, had been refused by an unidentified female at **SUBJECT PREMISES 2**, and that the parcel would be returned to the sender in New York.

31.   TFO Callahan stated that on December 1, 2022, he obtained aerial surveillance photos of **SUBJECT PREMISES 2**. TFO Callahan described **SUBJECT PREMISES 2** as a large corner lot property located

at the north-east intersection of Cherry Avenue and Lincoln Street. TFO Callahan advised that **SUBJECT PREMISES 2** had three primary structures, a main residence located in the center, and a trailer and shed located on the south side of the property. TFO Callahan further advised the perimeter of **SUBJECT PREMISES 2** was surrounded by a block wall with motorized entry gates located on the west and south side of the property. TFO Callahan stated that while reviewing the aerial photos, he observed the white Jeep and the gold Toyota Corolla with no visible license plate, parked adjacent to the trailer. As previously stated, the white Jeep had been identified by the SOI as the vehicle used by the bearded male who had shipped the kilogram of fentanyl seized by SA Garcia and myself on December 9, 2022. TFO Callahan stated that he conducted a subsequent physical surveillance of **SUBJECT PREMISES 2** and identified the license plate for the gold Toyota Corolla to be California State license plate number 9BTJ979. A DMV registration query revealed the gold Toyota Corolla was registered to Oscar Efrain Luna, at **SUBJECT PREMISES 2.**

32. On or about December 20, 2022, DEA RDO installed two closed-circuit television ("CCTV") cameras covering the west and south entry gates of **SUBJECT PREMISES 2.**

33. On December 21, 2022, at approximately 10:32 a.m., during live CCTV monitoring of **SUBJECT PREMISES 2**, I observed the white Jeep arrive at **SUBJECT PREMISES 2**, and park next to the trailer and shed located on the south side of **SUBJECT PREMISES 2.** After a few minutes, I observed the bearded male, wearing a black

ball cap, exit the vehicle and walk out of view toward the trailer and shed.

34.   On December 22, 2022, at approximately 9:00 a.m., during CCTV monitoring, I observed that the white Jeep was parked at **SUBJECT PREMISES 2**, adjacent to the trailer and shed.

35.   At approximately 9:03 a.m., I observed a bearded male, wearing with a black ball cap, open the rear driver side door of the white Jeep and reach into the vehicle. I then observed the bearded male close the rear driver side door and then reach into the open front driver's side door. I subsequently observed the bearded male walk toward the east side of the main residence before re-entering the white Jeep and departing **SUBJECT PREMISES 2** through the south entry gate.

36.   Based on the foregoing, I formed the opinion that the bearded male driver of the white Jeep, was the individual who shipped the kilogram of fentanyl on November 21, 2022, that was subsequently seized on December 9, 2022 by SA Garcia and myself. I further formed the opinion that the bearded male frequently travels to **SUBJECT PREMISES 2,** and maintains dominion and control over the location, as demonstrated by his ability to acces the property through the secure motorized gates. Based on the bearded male's involvement in drug trafficking, as well as his continued presence at **SUBJECT PREMISES 2**, I believe the bearded male was the intended recipient of the UPS parcel suspected of containing $10,000 in drug proceeds that was delivered to, and subsequently refused at **SUBJECT PREMISES 2**. As previously stated, during September 2022, the bearded male had successfully sent a suspicious

UPS parcel to Rochester, New York; this was one month before the UPS parcel suspected of containing $10,000 in drug proceeds was shipped from New York to **SUBJECT PREMISES 2**.

    **E.    Seizure of $20,000 U.S. Currency on December 30, 2022**

37.   On December 30, 2022, members of the Ontario Regional Interdiction of Narcotics Task Force were conducting parcel interdiction operations when officers observed an inbound UPS parcel, bearing tracking number 1ZA1486X1584311945, sent from Sherrod Daniel, 2913 Links Drive SE, Atlanta, Georgia, to Efrian Luna, at **SUBJECT PREMISES 1**. As previously described, **SUBJECT PREMISES 1** is the registered address of the white Jeep, which was used by the bearded male to transport the fentanyl-laden parcel to the Yucaipa UPS Store on November 21, 2022, that was ultimately seized on December 9, 2022 by SA Garcia and me.

38.   Upon further examination, officers observed that the UPS parcel was being shipped "UPS early" which is one of the more expensive services UPS offers. In addition, officers observed that all the seams to the parcel were taped closed, which I know to be a common technique used by drug traffickers to thwart the use of narcotic detection canines. Based on the foregoing, officers utilized a narcotic detection canine to conduct a free air sniff, resulting in a positive alert to the odor of narcotics emanating from the parcel.

39.   On December 30, 2022, the Honorable Kawika Smith, Judge of the Superior Court of California, County of San Bernardino, signed California State search warrant 000103831, authorizing the search of the parcel. A subsequent search

resulted in the seizure of approximately $20,000 U.S. Currency, contained within a shoebox, further contained within a white envelope. The currency was subsequently seized as drug proceeds pursuant to Title 21 U.S.C. 881.

40.   Based on my training and experience, and my knowledge of this investigation, I believe the bearded male and driver of the white Jeep to be a multi-kilogram source of fentanyl and the recipient of drug proceeds at **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2**. I believe that during September, October, and November 2022, the bearded male shipped at least five narcotics-laden parcels from the Yucaipa UPS Store, two of which were seized and determined to contain a total of 3 kilograms of fentanyl, to narcotic traffickers in New York, North Carolina, and Georgia. I believe that after the successful arrival of at least two narcotics-laden parcels, traffickers from New York and Georgia shipped cash via UPS to the bearded male at **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2**, as demonstrated by the attempted delivery of the parcel suspected to contain $10,000 U.S. Currency to **SUBJECT PREMISES 2** and the seizure of the parcel containing $20,000 U.S. Currency while en route to **SUBJECT PREMISES 1**. As previously detailed, both cash-laden parcels originated from locations where the bearded male had shipped either suspicious parcels, or parcels known to contain fentanyl.

**F.   Surveillance of SUBJECT PREMISES 1 on February 1, 2023**

41.   On February 1, 2023, I and other members of the DEA RDO established surveillance of **SUBJECT PREMISES 1**. On that day,

I observed the white Jeep parked in the driveway of **SUBJECT PREMISES 1,** and the gold Toyota Corolla (which was previously observed at **SUBJECT PREMISES 2),** parked across the street. As previously described, the gold Toyota Corolla was registered to Oscar Efrain Luna at **SUBJECT PREMISES 2.** I noted that the name Oscar Efrain Luna was almost identical to the recipient name ("Efrian Luna") of the parcel containing $20,000 U.S. Currency seized en route to **SUBJECT PREMISES 1** on December 30, 2022.

42.   At approximately 11:40 a.m., I observed a dark colored Ford F-150 with trailer arrive at **SUBJECT PREMISES 1.** I observed a bearded Hispanic male wearing a black ball cap ("bearded male") walk from the front of **SUBJECT PREMISES 1** and greet the occupant of the Ford F-150. I immediately recognized the bearded male as the same individual from the UPS Store surveillance footage who had shipped the fentanyl-laden parcels.

43.   At approximately 12:07 p.m., surveillance observed the bearded male enter the white Jeep and reposition it in the driveway of **SUBJECT PREMISES 1.**

44.   At approximately 12:55 p.m., I observed the bearded male enter the gold Toyota Corolla and depart **SUBJECT PREMISES 1.** Deputies from the Riverside County Sheriff's Department conducted a vehicle stop of the gold Toyota Corolla for excessive window tint in violation of California Vehicle Code § 26708. Upon approaching the vehicle, the bearded male identified himself with a valid California driver's license in the name of David Guillermo CORRAL-CARDENAS, and the address of **SUBJECT PREMISES 2.** CORRAL-CARDENAS told officers that he had

17

moved from Sinaloa, Mexico to the United States approximately two years before. CORRAL-CARDENAS stated that he used to live at **SUBJECT PREMISES 2,** but was currently living with his wife and in-laws at a residence in San Jacinto, California (**SUBJECT PREMISES 1**). Upon request, CORRAL-CARDENAS consented to a search of his person and the gold Toyota Corolla. During the search, deputies observed that CORRAL-CARDENAS was in possession of three cellular phones and a large bundle of U.S. Currency, consisting mostly of $100 denominations. When asked about his employment, CORRAL-CARDENAS stated he was in the "pallet business." During a search of the gold Toyota Corolla, deputies noticed the center console tray was removable, revealing a natural cavity below. Upon closer inspection, deputies observed two cables that were screwed to the interior of the console and ran the length of the vehicle. Deputies further noted that the cables appeared to be a non-factory alteration and appeared to serve no conventional purpose. Based on their inspection, deputies suspected the gold Toyota Corolla to have a motorized hidden compartment, commonly referred to as a "trap."

45. A subsequent examination of Department of Motor Vehicles Records showed that on February 2, 2022, the gold Toyota Corolla was re-registered in the name of "D. Guillmero CORRAL CARDENAS" (CORRAL-CARDENAS) at **SUBJECT PREMISES 2.**

46. Based on the foregoing, I believe that the bearded male, who had shipped two kilograms of fentanyl to Cleveland, North Carolina on October 12, 2022 and one kilogram of fentanyl to Atlanta, Georgia on November 21, 2022, is CORRAL-CARDENAS. As

previously stated, I recognized CORRAL-CARDENAS as the individual who had shipped the fentanyl-laden parcels, from the surveillance footage recovered from the Yucaipa UPS Store. Moreover, I observed CORRAL-CARDENAS operate the white Jeep, the vehicle used to deliver the kilogram of fentanyl on November 21, 2022, as well as the gold Toyota Corolla, which I suspect to be a "trapped" vehicle. Based on my training and experience, I know that narcotics traffickers will use trapped vehicles to conceal and transport large quantities of controlled substances. Based on the foregoing, I obtained California State search warrants authorizing the installation and GPS monitoring of the white Jeep and gold Toyota Corolla.

**G.    Seizure of 1 Kilogram of Fentanyl on February 13, 2023**

47.   On February 2, 2023, the Honorable David A. Gunn, Judge of the Superior Court of California, County of Riverside, signed a California State search warrant authorizing the installation and GPS monitoring of the white Jeep and gold Toyota Corolla for 30 days.

48.   On February 3, 2023, members of the DEA RDO commenced with the GPS monitoring of the white Jeep and the gold Toyota Corolla.

49.   On February 13, 2023, subsequent to the GPS monitoring of the gold Toyota Corolla, SA Dennis Schupp and I seized a UPS parcel containing one kilogram of fentanyl, shipped by CORRAL-CARDENAS from the Beaumont UPS Store. The following is a chronological accounting of the events leading to the seizure of the fentanyl, to include information learned after the fact,

such as locations and times of arrival/departure of the gold
Toyota Corolla, and subsequent surveillance footage recovered
from the Walmart Beaumont and the Beaumont UPS Store.

50.  On February 13, 2023, at approximately 10:51 a.m., GPS
monitoring revealed that the gold Toyota Corolla (occupied by
CORRAL-CARDENAS) departed **SUBJECT PREMISES 1** and made several
stops before arriving at the Walmart Beaumont (located at 1540
East 2nd Street, Beaumont, California), at 12:28 p.m. GPS
monitoring revealed that the gold Toyota Corolla was located in
the Walmart Beaumont parking lot from 12:28 p.m. until 12:49
p.m.

51.  SA Dennis Schupp and I later obtained the Walmart
Beaumont surveillance footage for the time period the gold
Toyota Corolla was located at the Walmart Beaumont. The
surveillance footage revealed that at approximately 12:29 p.m.
(one minute after the arrival of the gold Toyota Corolla),
CORRAL-CARDENAS entered the Beaumont Walmart via the east doors.

52.  On February 13, 2022 at approximately 12:42 p.m.,
CORRAL-CARDENAS approached the self-checkout register and
purchased several items, to include a Vaultz brand "Cash
Box" lock box, gloves, and a roll of foam wrap. Upon scanning
all items, CORRAL-CARDENAS was observed removing a bundle of
U.S. Currency from his right pants pocket, and placing a $100
bill into the automated register. At approximately 12:44 p.m.,
CORRAL-CARDENAS examined his receipt before obtaining his change
and departed the register with his purchased items.

53.  GPS monitoring revealed that at approximately 12:49 p.m., the gold Toyota Corolla departed the Wal Mart Supercenter parking lot and traveled directly to **SUBJECT PREMISES 2**. CCTV monitoring of **SUBJECT PREMISES 2** confirmed the gold Toyota Corolla entered **SUBJECT PREMISES 2** through the south gate and parked adjacent to the trailer and shed on the south side of the property. GPS monitoring revealed the gold Toyota Corolla remained at **SUBJECT PREMISES 2** for approximately three hours and thirty-eight minutes.

54.  At approximately 4:27 p.m., GPS monitoring revealed the gold Toyota Corolla departed **SUBJECT PREMISES 2** and traveled directly to the Beaumont UPS Store, arriving at approximately 4:31 p.m. I later obtained a copy of the UPS Store surveillance for the time period the gold Toyota Corolla was located at the UPS Store location. The surveillance footage showed that at approximately 4:33 p.m. (two minutes after the arrival of the gold Toyota Corolla), CORRAL-CARDENAS was standing inside the UPS Store examining an empty white shipping box. CORRAL-CARDENAS is then observed carrying the white shipping box toward the UPS Store register line.

55.  At approximately 4:43 p.m., the gold Toyota Corolla departed the UPS Store parking lot and traveled directly to **SUBJECT PREMISES 2**. CCTV camera footage showed the gold Toyota Corolla entering the south gate and parking next to the trailer and shed.

56.  At approximately 4:56 p.m., nine minutes after its arrival, GPS monitoring revealed that the gold Toyota Corolla

departed **SUBJECT PREMISES 2** and again drove directly to the Beaumont UPS Store, arriving at 5:01 p.m.  CCTV camera footage revealed that prior to departing **SUBJECT PREMISES 2**, CORRAL-CARDENAS placed a weighted white box, identical to the white box he had purchased minutes before at the UPS Store, into the trunk of the gold Toyota Corolla.

57.  At approximately 5:02 p.m., approximately one minute after the arrival of the gold Toyota Corolla, UPS Store surveillance footage showed CORRAL-CARDENAS, now wearing a facial covering, enter the UPS Store carrying a white shipping box. The surveillance footage showed CORRAL-CARDENAS approaching the counter and transferring the white shipping box to a UPS Store employee for shipment.

58.  At approximately 5:10 p.m., surveillance footage showed CORRAL-CARDENAS examining his receipt before turning and exiting the UPS Store.

59.  At approximately 5:17 p.m., GPS monitoring revealed that the gold Toyota Corolla departed the UPS Store parking lot and traveled directly to **SUBJECT PREMISES 2**, arriving at approximately 5:22 p.m.

60.  At approximately 5:20 p.m., SA Schupp and I arrived at the Beaumont UPS Store and learned that a male matching the description of CORRAL-CARDENAS had shipped a white box weighing approximately 6 pounds and bearing UPS tracking number 1Z Y07 3V7 12 6223 8978) via the Three-Day Select option to an address in Atlanta, Georgia.

61.   Upon examination of the shipping label, I observed that the UPS parcel was being shipped from "Ryan RUIZ, (213)348-4525, 1523 Grandview Drive, Banning California" to "Lorraine SMITH, 1120 Metropolitan Parkway Southwest, Atlanta, Georgia." A commercial database search failed to identify individuals with the shipper or recipient names associated to either the shipping or recipient addresses.

62.   Based on CORRAL-CARDENAS' previously seized fentanyl-laden UPS parcel to Atlanta, Georgia, the recent cash seizure from a UPS parcel sent from Atlanta, Georgia to CORRAL-CARDENAS' residence (**SUBJECT PREMISES 1**), and CORRAL-CARDENAS' multiple trips from **SUBJECT PREMISES 2** to the UPS Store, I formed the opinion that CORRAL-CARDENAS was attempting to ship another fentanyl-laden parcel from the UPS Store to narcotic traffickers in Atlanta, Georgia.

63.   SA Dennis Schupp and I took custody of the white UPS parcel bearing UPS tracking number 1Z Y07 3V7 12 6223 8978 from the UPS Store and requested that Riverside Police Department (RPD) Detective David Bee utilize his narcotic detection canine partner, "Kilo", to conduct a free air sniff of the parcel. Following the free air sniff, Detective Bee advised that Kilo had made a positive alert to the odor of narcotics emanating from the UPS parcel.  A statement describing Detective Bee's and Kilo's training and experience in narcotics detection is attached hereto as Exhibit B.

64.   On that same date, the Honorable Samuel Diaz Jr., Judge of the Superior Court of California, County of Riverside,

signed California State search warrant RI0215202319, authorizing
the search of the UPS parcel. Upon opening the white shipping
box, SA Schupp and I observed a locked Vaultz brand "Cash Box"
covered in foam wrapping, identical to the packaging of the
kilogram of fentanyl that was seized on December 9, 2022 at the
Yucaipa UPS Store. I opened the cash box and observed a
kilogram-shaped brick, wrapped in a white trash bag and further
contained within plastic sheeting, a red jelly substance, and
carbon paper. A subsequent analysis by the DEA SWRL established
that the kilogram brick tested positive for fentanyl.

65.   On March 10, 2023, at approximately 11:25 a.m., DEA
RDO agents established surveillance of SUBJECT PREMISES 1.
During the course of the surveillance, I observed CORRAL-
CARDENAS exit the front door of SUBJECT PREMISES 1 and depart
the location in his gold Toyota Corolla. Agents subsequently
followed the gold Toyota Corolla to the local grocery store
where CORRAL-CARDENAS was observed purchasing groceries before
returning to and entering SUBJECT PREMISES 1.

66.   On March 11, 2023, GPS monitoring revealed that at
approximately 2:23 p.m., the white Jeep departed SUBJECT
PREMISES 1 and traveled to the Beaumont area. Continued GPS
monitoring revealed that at approximately 4:11 p.m., the white
Jeep arrived at SUBJECT PREMISES 2 and remained for
approximately 90 minutes. I subsequently watched live CCTV of
SUBJECT PREMISES 2 and observed the white Jeep park on the south
side of the property at SUBJECT PREMISES 2, east of the trailer.
Your affiant observed CORRAL-CARDENAS exit the white Jeep and

walk to the north side of the trailer and shed, out of view. After approximately one hour, I observed CORRAL-CARDENAS walk from the trailer and shed, carrying three large trash bags, and place them into trash bins located on the south side of the main residence. I then observed CORRAL-CARDENAS return to the trailer and shed area out of view.

67.  Based on CORRAL-CARDENAS' recent activity at both SUBJECT PREMISES 1 on March 10, 2023 and SUBJECT PREMISES 2 on March 11, 2023, I believe that CORRAL-CARDENAS currently maintains dominion and control over SUBJECT PREMISES 1 and the trailer, shed, and trash bins located at SUBJECT PREMISES 2, and that he uses the SUBJECT PREMISES to facilitate his drug trafficking activities.

68.  Based on my training and experience, and my knowledge of this investigation, I believe CORRAL-CARDENAS to be a kilogram-quantity source of fentanyl powder operating within the Central District of California, and that CORRAL-CARDENAS utilizes **SUBJECT PREMISES 1** and **SUBJECT PREMISES 2** to facilitate his drug trafficking activities, to store and package controlled substances for shipment and receipt of drug related proceeds.

69.  Based on my training and experience, I know narcotic traffickers commonly avoid storing controlled substances at their homes, in favor of using secondary locations, referred to as "stash locations." Despite these precautions, I know that narcotic traffickers such as CORRAL-CARDENAS will maintain other evidence of drug trafficking at their residence(s), such as

communication devices, drug ledgers, shipping labels, and drug proceeds.

70.  Given the inherent value of narcotics and their derived proceeds, and the violence associated with drug trafficking, I know that it is common for narcotic traffickers to maintain weapons, such as firearms, in their vehicles, places of residence and stash locations as means to protect themselves and their investment from other traffickers.

71.  Based on my training and experience, I also know it is common for narcotic traffickers to use cellular phones to communicate with prospective narcotic customers and sources of supply. Given their portability and ease of use, I know drug traffickers will maintain the cellular phones on their person, so they may contact or be contacted at any given moment. Based on the distant locations to where CORRAL-CARDENAS is shipping his controlled substances, I believe CORRAL-CARDENAS is unable to communicate "face to face" with the recipients of his narcotics-laden parcels, and must use communication platforms via his cellular phone to communicate details regarding the delivery of said parcels. Based on my training and experience, I know that it is common for drug traffickers, such as CORRAL-CARDENS, to use and frequently discard multiple cellular phones, in an attempt to thwart law enforcement's ability to identify them and members of their DTO. Based on officers' observations of three cellphones in CORRAL-CARDENAS's possession during the above-described traffic stop on February 1, 2023, I believe CORRAL-CARDENAS is utilizing at least three cellular phones, and

potentially other devices, to communicate with his customers and
sources of supply, and that those devices are likely to be found
at **SUBJECT PREMISES 1** and at **SUBJECT PREMISES 2**.

<u>**TRAINING AND EXPERIENCE ON DIGITAL DEVICES**</u>[3]

72.  Based on my training, experience, and information
from those involved in the forensic examination of digital
devices, I know that the following electronic evidence, inter
alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

---

[3] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

73. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

74. The search warrant requests authorization to use the biometric unlock features of a device, based on the following,

which I know from my training, experience, and review of
publicly available materials:

      a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of

the warrant: (1) depress CORRAL-CARDENAS's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of CORRAL-CARDENAS's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

**CONCLUSION**

75.  For all the reasons described above, there is probable cause to believe that October 13, 2022, November 21, 2022, and on February 13, 2023, David Guillermo CORRAL-CARDENAS violated Title 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute, a Controlled Substance), 846 (Attempt and Conspiracy to Commit Controlled Substance Offense), and 856 (Maintaining Drug-Involved Premises).

76.  Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at **SUBJECT PREMISES 1** as described in Attachment A-1, and **SUBJECT PREMISES 2**, as described in Attachment A-2.

```
                                    /s/ signed pursuant to
                                    Fed. R. Crim. P. 4.1
                                    _____
                                    Paul Gelles, Special Agent
                                    Drug Enforcement
                                    Administration
```

```
Subscribed to and sworn before me
this 15th day of March, 2023.
```

_____
HONORABLE KENLY KIYA KATO
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A-1</u>

<u>PREMISES TO BE SEARCHED</u>

**SUBJECT PREMISES 1** is located at 365 West 6th Street, San Jacinto, California and is described as a single-story single-family residence with tan stucco, white trim, and a black shingle roof. The two-car garage door is white in color and is located on south side of the residence facing south. The numbers "365" are clearly displayed in black lettering over a white background on the curb and in black lettering on a white mail box directly in front of the residence.

## ATTACHMENT A-2

<u>PREMISES TO BE SEARCHED</u>

**SUBJECT PREMISES 2** is located at 10776 Cherry Avenue, Cherry Valley, California and is described a large property located at the northeast corner of Cherry Avenue and Lincoln Street in Cherry Valley, California. Located on the south side of the property is a white and blue trailer and a tan shed with a brown shingle roof.  There are trash bins located near the trailer and shed.  The perimeter of the property is encircled in a block wall/chain link fence with motorized access gates on the west and south sides of the property.[4]

---

[4] Also located on the property is a main residence, described as single-story single-family residence with tan stucco and a terracotta tile roof.  This residence is specifically excluded from the premises to be searched on the property defined as **SUBJECT PREMISES 2.**

## ATTACHMENT B

I.  **ITEMS TO BE SEIZED**

1.  The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 21 U.S.C. §§ 841(a)(1) (Manufacturing, Distribution of, and Possession with Intent to Distribute, a Controlled Substance), 846 (Attempt and Conspiracy to Commit Controlled Substance Offense), and 856 (Maintaining Drug-Involved Premises) (the "Subject Offenses"), namely:

a.  Any controlled substance, controlled substance analogue, or listed chemical;

b.  Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.  Firearms, ammunition, and firearm parts;

d.  Items used in the packaging of currency for

e.  consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

f.  United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages

over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

g.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

h.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

i.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

j.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

k.   Audio recordings, pictures, video recordings, or still captured images concerning the purchase, sale, transportation, or distribution of drugs, firearms, or ammunition;

l.   Contents of any calendar or date book;

m.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations from September 1, 2022 to the present; and

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as

viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.  applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

vii. records of or information about Internet Protocol addresses used by the device.

2.  As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart

phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

II.  <u>**SEARCH PROCEDURE FOR DIGITAL DEVICES**</u>

4.  In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search
warrant will employ the following procedure:

a.  Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

b.  The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the scope of items to be

seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

6. During the execution of this search warrant, law enforcement is permitted to: (1) depress CORRAL-CARDENAS's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of CORRAL-CARDENAS's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7. The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.